UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TENNESSEE ENVIRONMENTAL COUNCIL, TENNESSEE SCENIC RIVERS ASSOCIATION, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>TENNESSEE VALLEY AUTHORITY,<br><br>Defendant. | **PLANTIFFS' RESPONSE IN OPPOSITION TO TVA'S MOTION TO TRANSFER VENUE**<br><br>**Case No. 3:13-cv-00383**<br>**Chief Judge Haynes** |

## INTRODUCTION

Defendant Tennessee Valley Authority ("TVA") has moved to transfer this case from a Court of proper venue chosen by Plaintiffs to a venue it prefers. TVA offers no legitimate reason for transferring this case and disturbing Plaintiffs' choice of venue. This action under the National Environmental Policy Act ("NEPA") does not conflict with the Consent Decree that resolved Clean Air Act litigation in the Eastern District of Tennessee, nor is this case legally or practically "intertwined" with that previous litigation.

TVA tries to suggest that Sierra Club, one of the Plaintiffs in this case, is undermining the settlement in the Eastern District with this NEPA suit. However, the parties to the Consent Decree agreed to leave the fate of the Gallatin plant unsettled, giving TVA the choice to retrofit, retire, or repower the plant by December 2017. The Consent Decree required that TVA, in selecting and implementing one of these options, comply with all applicable laws, including NEPA. Thus, it is entirely consistent with the Consent Decree for Plaintiffs, including Sierra

Club, to challenge TVA's failure to undertake the requisite environmental review before approving a major Life Extension Project for the Gallatin Fossil Plant. As the Consent Decree does not purport to govern venue in subsequent litigation, TVA cannot rely on it to upset the proper choice of venue made not only by the Sierra Club but also by several additional parties who have a local stake in the fate of the Gallatin Plant and a corresponding interest in seeing this case go forward in the Middle District.

Nevertheless, TVA insists that transfer is warranted because this case is somehow "intertwined" with the Clean Air Act litigation and Consent Decree in the Eastern District. However, the legal issues in this NEPA case are wholly distinct from the Clean Air Act issues underlying the Consent Decree, and the Consent Decree does not excuse or otherwise govern TVA's mandatory compliance with NEPA. Further, it is untrue that "[t]he relief that Plaintiffs seek here is inconsistent with what the Eastern District's Consent Decree requires TVA to do at Gallatin." (Doc. 18, TVA Br. at 3.) As the Consent Decree does not require TVA to retrofit the Gallatin Plant, enjoining the retrofit project pending compliance with NEPA would not preclude compliance with the Consent Decree by retiring or repowering. In any case, TVA makes no showing that compliance with NEPA is incompatible with meeting its December 2017 Consent Decree deadline.

Finally, even if a ruling in this case prompts TVA to request a modification of the Consent Decree deadlines, the implications for judicial efficiency are the same whether this case is in the Middle or Eastern District. In either scenario, litigation over the Consent Decree will involve different issues and a different set of parties.

2

Case 3:13-cv-00383   Document 19   Filed 06/03/13   Page 2 of 16 PageID #: 388

## STATEMENT OF PERTINENT FACTS

### The Gallatin Coal Plant

TVA's decision to retrofit, as opposed to retiring, the coal-fired Gallatin Plant has serious consequences for surrounding communities because it is a major source of waste and pollution. The Plant is located along the banks of the Cumberland River and Old Hickory Lake, a popular recreational reservoir, in Sumner County, Tennessee. It is a few miles upstream of the town of Gallatin and approximately 30 miles upstream of Nashville. The facility includes four 54-year old coal-fired units with a combined summer net capability[1] of 976 megawatts.

Burning coal to generate electricity at the Gallatin Plant is a resource-intensive, highly polluting process. Each day, the Gallatin Plant burns approximately 12,350 tons of coal[2] and withdraws over 930 million gallons of water from the Cumberland River for use in plant operations and as cooling water.[3]

As a result of this process, the Gallatin Plant generates between 190,000 and 240,000 tons of coal ash and sludge and other combustion waste each year.[4] TVA disposes of this waste in onsite landfills. In 2011, TVA reported that the coal waste it dumped into onsite waste ponds contained more than 2.5 million pounds of toxic metals, including barium, chromium, copper, lead, manganese, mercury, thallium, vanadium, and zinc, making it the tenth largest disposer of

---

[1] The term "net capability" is a measure of how much power a plant can generate for a specified time period, minus the power used by the plant itself.
[2] See TVA, *Gallatin Fossil Plant: Facts & Figures*, available at http://www.tva.com/sites/gallatin.htm (last visited May 24, 2013).
[3] Exh. 1, TVA, Gallatin Fossil Plant – NPDES Permit No. TN0005428, at Section VIII, *Rationale*, issued June 26, 2012.
[4] Exh. 2b, TVA, Final Environmental Assessment – Installation of Emission Control Equipment and Related Facilities at Gallatin Fossil Plant ("Gallatin Final Environmental Assessment"), at 50.

toxic coal combustion waste in the country.[5] The Plant discharges over 950 million gallons of contaminated waste water a day from its coal-related operations into Old Hickory Lake.[6] Annually, these discharges contain almost 50,000 pounds of toxic heavy metals including barium, chromium, copper, vanadium, and zinc.[7]

The Gallatin Plant also is a major source of harmful air pollution. In 2011, the Gallatin coal units emitted more than 7.5 million tons of carbon dioxide[8], nearly 29,000 tons of soot- and smog-forming air pollution[9], and close to 144 tons of hazardous air pollutants, including mercury, other toxic metals, acid gases, and organic compounds.[10]

Collectively, the massive waste disposal operation and the water and air pollution from the Gallatin Plant most directly and acutely affect people who live, work, and recreate in the vicinity of the plant, including Plaintiffs' members.[11]

---

[5] *See* TVA, *Gallatin Fossil Plant Emissions Reported to Toxic Release Inventory*, available at http://www.tva.com/environment/air/gallatin.htm#tri (last visited May 28, 2013); *see also* Exh. 3, Excerpt from EPA's Toxic Release Inventory coal ash disposal data (Nov. 29, 2012) (Gallatin's ranking is based on a query of facility-specific toxic releases reported by the utility sector to EPA for 2011, the last year of publicly available data, and a ranking of on-site surface impoundment data. When all reported on-site and off-site land disposal data are included, Gallatin ranks tenth.)

[6] Exh. 2b, TVA, Gallatin Final Environmental Assessment, at 50.

[7] *See* TVA, *Gallatin Fossil Plant Emissions Reported to Toxic Release Inventory*, available at http://www.tva.com/environment/air/gallatin.htm#tri (last visited May 28, 2013).

[8] Exh. 2b, TVA, Gallatin Final Environmental Assessment, at 47.

[9] *See* TVA, *Gallatin Fossil Plant Emissions*, available at http://www.tva.com/environment/air/gallatin.htm (last visited May 28, 2013).

[10] *See* TVA, *Gallatin Fossil Plant Emissions Reported to Toxic Release Inventory*, available at http://www.tva.com/environment/air/gallatin.htm#tri (last visited May 28, 2013).

[11] *See, e.g.*, Exh. 4, Declaration of Michelle Haynes ¶¶ 2, 4, 9-10, 13 (Apr. 19, 2013); Exh. 5, Declaration of Kara Carden ¶¶ 2, 7, 10, 13 (Apr. 30, 2013); Exh. 6, Declaration of Charles Wilkerson ¶¶ 4-6, 8-9, 11 (Apr. 25, 2013); Exh. 7, Declaration of Jessica J. Beckett ¶¶ 1, 4-7, 10-11 (Apr. 22, 2013); and Exh. 8, Declaration of Joseph R. Prochaska ¶¶ 6-10, 13-17, 20 (Apr. 9, 2013).

**Clean Air Act Enforcement Actions and Consent Decree[12]**

In June 2011, TVA entered into two substantively identical settlement agreements to resolve three related Clean Air Act enforcement actions filed by EPA, four states (Alabama, Kentucky, North Carolina, and Tennessee), and three non-profit environmental organizations (National Parks Conservation Organization, Our Children's Earth Foundation, and Sierra Club).[13] The enforcement actions alleged that TVA had violated the Clean Air Act's new source review provisions by modifying and significantly increasing air pollution emissions at 59 coal-fired units located in three states without obtaining required Clean Air Act permits and installing modern pollution controls. Both the Federal Facilities Compliance Agreement (between TVA and EPA) and the Consent Decree (between TVA and the states and non-profit environmental organizations) addressed the alleged Clean Air Act violations at the Gallatin Plant, among others.

In the Consent Decree, the parties agreed that TVA would transform its fleet into a cleaner power system "by reducing air emissions from coal-fired power plants, by retiring some coal-fired units, and by relying more on lower-emitting and non-emitting generation like natural gas and nuclear energy units and energy-efficiency and demand response programs," and that these measures "will achieve significant reductions of emissions from the TVA System and

---

[12] In addition to the Consent Decree, TVA has identified two other reasons it must reduce air pollution emissions from the Gallatin plant. First, TVA must reduce emissions of hazardous air pollutants from the Gallatin Plant to the maximum extent achievable by April 16, 2015 (with a possible one-year extension) in order to comply with EPA's Mercury and Air Toxics Standards (or "MATS"). *See* Exh. 2a, TVA, Final Environmental Assessment at 1. Second, TVA also explains that EPA is expected to tightened air quality standards that would require additional reductions of air pollution emissions from power plants. *Id.*

[13] *See* Exh. 9, Federal Facilities Compliance Agreement, *In the Matter of Tennessee Valley Authority*, Docket No. CAA-04-2010-1760 (resolving enforcement action filed by EPA); and Exh. 10, Consent Decree, *Alabama, et al. v. TVA*, No. 3:11-cv-170, *Nat'l Parks Conservation Ass'n, Inc., et al. v. TVA*, No. 3:11-cv-171 (E.D. Tenn. June 30, 2011) (resolving enforcement action filed by states and non-profit organizations).

5

thereby significantly improve air quality."[14] With respect to the Gallatin coal units, the Consent Decree specifies three acceptable options for reducing air pollution emissions: by December 31, 2017, TVA must install pollution control retrofits to reduce emissions of nitrogen oxides and sulfur dioxide, repower the units with renewable biomass, or retire the units.[15]

Importantly for purposes of TVA's motion in this case, the Consent Decree resolved TVA's alleged past violations of the Clean Air Act's new source review provisions only.[16] The parties to the Consent Decree expressly agreed that the citizen Plaintiffs, including Sierra Club, "reserve[d] their rights to bring any actions against TVA for any claims arising after the Date of Lodging of [the] Consent Decree."[17] Similarly, the Consent Decree provides that "nothing in this Consent Decree shall relieve TVA of its obligation to comply with all applicable federal, state, and/or local laws," which necessarily include NEPA.[18]

### The NEPA Lawsuit

Plaintiffs Tennessee Environmental Council, Tennessee Scenic Rivers Association, Sierra Club, and Center for Biological Diversity ("Plaintiffs") filed this lawsuit seeking declaratory and injunctive relief based on TVA's alleged violations of NEPA. (Doc. 1, Compl. ¶¶ 1, 6.) Plaintiffs contend that TVA decided to construct air pollution control equipment and associated facilities, including haul roads, transmission lines and two massive coal-combustion waste landfills, at the Gallatin Plant (the "Life Extension Project") based on undisclosed analysis of "various possible scenarios related to pollution controls at Gallatin" that TVA has withheld from

---

[14] Exh. 10, Consent Decree at 4.
[15] *Id.* at ¶¶ 69, 85.
[16] *Id.* at ¶ 132.
[17] *Id.* at ¶ 133.
[18] *Id.* at ¶ 203.

6

the public.[19]  Only after TVA had already reached a decision to retrofit the Gallatin plant did it embark on a public NEPA process, in which it declined to give meaningful consideration to any alternative other than the Life Extension Project (with minor variations).  (Doc. 1, Compl. ¶ 5.)  Most glaringly, TVA ignored the most obvious and cost-effective alternative to protect public health and the environment—retirement of the Gallatin Plant, an option that was expressly contemplated under the Consent Decree.[20]

For people who live, work, and recreate in the vicinity of the Gallatin Plant, TVA's decision to keep the plant running has serious adverse consequences.  While the Life Extension Project would reduce emissions of some air pollutants, the Gallatin coal units would continue to emit over 4,442 tons of soot-forming sulfur dioxide, 1,100 pounds of smog-forming nitrogen oxides, and 39.2 pounds of toxic mercury pollution every year, and the Plant's annual carbon dioxide emissions of 7.5 million tons per year would continue unabated.  (Doc. 1, Compl. ¶ 61.)

Further, operation of the new air pollution controls would cause the Gallatin Plant to generate two to five times more coal combustion waste than it currently does, resulting in disposal of 411,000 – 877,000 tons of waste per year.  (Doc. 1, Compl. ¶ 62.)  To accommodate this waste, TVA would construct two 12-story landfills spanning over 170 acres within a forested wildlife management area.  The project also would perpetuate the discharge of toxic heavy metals and other harmful pollution into Old Hickory Lake, a popular recreation area and

---

[19] *See* Exh. 11, Letter from J. Brewer, Vice President, Communications, TVA to C. Segall, Staff Attorney, Sierra Club (Feb. 11, 2013).
[20] In its motion, TVA implies that its Integrated Resource Plan ("IRP") supports its decision to retrofit the Gallatin Plant.  But the IRP does nothing of the sort.  The IRP does not once mention Gallatin.  Further, the IRP concludes that TVA should consider increasing its energy efficiency resources by 3,600 megawatts to 5,100 megawatts, adding 1,500 megawatts to 2,500 megawatts of renewable energy resources, and idling between 2,400 megawatts and 4,700 megawatts of coal-fired capacity by 2017.  *See* Exh. 12, TVA's Integrated Resource Plan at 17, fig. 5 (March 2011).

7

reservoir supplying drinking water for thousands of people living in and near Nashville. (Doc. 1, Compl. ¶ 2.) For all of these reasons, the Life Extension Project has been the subject of intense local controversy and concern. (Doc. 1, Compl. ¶¶ 91, 120-121.)

## **STANDARD OF REVIEW**

Courts "have broad discretion in ruling on motions to transfer venue under [28 U.S.C.] § 1404(a)." *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 958 (M.D. Tenn. 2008). In considering motions to transfer under § 1404(a), "a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 n.1 (6th Cir. 2002) (quoting *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991)); *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 537 (6th Cir. 2002). The relevant private interest factors to consider include: (1) the convenience of the parties and witnesses; (2) the accessibility of evidence; (3) the availability of process to make reluctant witnesses testify; (4) the costs of obtaining willing witnesses; (5) the practical problems of trying the case most expeditiously and inexpensively; and (6) the interests of justice. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). In addition, "[p]ublic interest factors include: (1) the enforceability of the judgment; (2) practical considerations affecting trial management; (3) docket congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law." *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 962 (M.D. Tenn. 2008).

These factors are not entitled to equal weight, however. "[O]ne of the most significant factors in considering whether venue should be transferred is the plaintiff's choice of forum,"

8

which is "entitled to 'substantial consideration.'" *Smith*, 578 F. Supp. 2d at 962 (citations omitted); *see also Wilderness Soc. v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000) (explaining that plaintiff's choice of forum "is afforded substantial deference"). To overcome a plaintiff's choice of venue, "the burden of proving that transfer is warranted under 28 U.S.C. § 1404(a) is on the moving party, and the burden is a substantial one." *Smith*, 578 F. Supp. 2d at 958 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Consequently, "unless the balance is strongly in favor the defendant, the plaintiff's choice of forum should rarely be disturbed." *Smith*, 578 F. Supp. 2d at 958 (quoting *Gulf Oil Corp.*, 330 U.S. at 508).

## ARGUMENT

TVA does not contend that venue in this Court is improper. *See, e.g., Smith v. Kyphon*, 578 F.Supp.2d 954, 957 (M.D. Tenn. 2008) (distinguishing between "a motion to dismiss for *improper* venue pursuant to Rule 12(b)" and "a motion to transfer to a more convenient venue under 28 U.S.C. § 1404(a)" (emphasis in original)). Instead, TVA argues that judicial economy and the systemic integrity of the judicial system alone warrant transfer of this case.[21] (Doc. 18, TVA Br. at 8-9.) TVA is wrong on both counts, and its motion provides no basis for overturning the presumption that "plaintiff's choice of forum should rarely be disturbed," *Smith*, 578 F. Supp. 2d at 958 (quoting *Gulf Oil Corp.*, 330 U.S. at 508).

### I. Transfer Would Not Promote Judicial Efficiency or the Convenience of the Parties.

TVA first argues that this Court should transfer this case under 28 U.S.C. § 1404(a) to avoid the potential for duplicative litigation. (Doc. 18, TVA Br. at 8.) TVA postulates that if Plaintiffs in this NEPA action prevail, TVA may need to seek relief from the compliance

---

[21]TVA does not even attempt to demonstrate the existence of any of the other private or public interests supporting transfer and concedes that the other factors are neutral. In fact, as Plaintiffs demonstrate in Section III below, Plaintiffs' choice of venue promotes the public's interest in deciding local controversies at home.

9

deadlines in the Consent Decree, which would require involvement of the Eastern District of Tennessee Court where the decree is lodged. *Id.* at 8-9. But TVA is mistaken legally and factually.

Legally, the relief Plaintiffs seek in this case is wholly distinct from the Consent Decree modification that TVA might at some point seek in the Eastern District. This is not the rare case that is inextricably intertwined with issues underlying a Consent Decree, and TVA's reliance on *Wayne Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*, 604 F. Supp. 2d 969 (E.D. Mich. 2009) and *Cherokee Exp. Co. v. Chrysler Intern. Corp.*, No. 96-1745, 1998 WL 57279 (6th Cir. Feb. 2, 1998)) is misplaced. (*See* Doc. 18, TVA Br., Doc. at 8.) In *Wayne County* the district court determined that interests of judicial efficiency trumped "the preference usually allocated to the plaintiff's choice of forum" and warranted transfer of one of several proposed class actions that involved the same class members and identical issues and causes of action. *Wayne Cnty. Emps.' Ret. Sys.*, 604 F. Supp. 2d at 977. In *Cherokee*, the parties litigated a dispute under a contract that included a forum selection clause, which was "a significant factor that figure[d] centrally in the district court's calculus." *Cherokee*, 1998 WL 57279, at *2.[22] Moreover, the court in *Cherokee* found that the transferee court had recently decided precisely the same question at issue between the same parties under the same statutory provisions, such that the decision in the prior case was *res judicata* over the transferred action. *Id.* Under these circumstances, principles of judicial efficiency supported transfer.

None of these factors is present here. This NEPA action involves different parties and arises under a very different statutory scheme than the Clean Air Act cases resolved in the

---

[22] Also of note, *Cherokee* was an unpublished opinion in which the Sixth Circuit expressed its disfavor with citations to unpublished opinions. *Cherokee* 1998 WL 57279, at *3. Pursuant to LR 7.01(e)(5), Plaintiffs have attached as Exhibit 13 a copy of the entire text of the decision in *Cherokee* 1998 WL 57279.

10

Consent Decree. The facts giving rise to the NEPA case, and TVA's obligation under NEPA to take a "hard look" at the full range of environmental consequences of its proposed actions <u>before</u> making a decision, are likewise separate and independent of the facts and legal duties that formed the bases for the Clean Air Act enforcement actions. And in no way does the resolution of the Clean Air Act cases have any *res judicata* implications for this NEPA action.

TVA's reliance on *Willoughby v. Potomac Elec. Power Co.*, 853 F. Supp. 174 (D. Md. 1994), is similarly misplaced. The circumstances supporting transfer in the *Willoughby* case are not present here. In *Willoughby*, the plaintiff's actions "unquestionably formed part of the factual predicate that underlay the [prior] litigation" and resulting consent decree. *Willoughby*, 853 F. Supp. at 175. The plaintiff thus directly challenged and attacked the terms of the decree and the representations on which the agreement was based. *Id.* Consequently, resolution of plaintiff's claims in *Willoughby* had the potential to threaten and undermine the integrity of the prior consent decree. *Id.* at 176.

Unlike *Willoughby*, this NEPA action does not question, challenge, or require interpretation of the terms or validity of the Consent Decree. In fact, in this case, Plaintiffs assert that TVA failed to seriously consider one of the air pollution control approaches specifically authorized under the Consent Decree—retirement of some or all of the Gallatin coal units. (Compl., Doc. No. 1 ¶¶ 2, 12, 15, 20, 22-25, 30-31). Moreover, none of the facts or actions at issue in the NEPA case formed a predicate for the Consent Decree. Quite the opposite: the Consent Decree sets in motion a series of decisions for TVA—including a decision as to how to reduce air pollution at the Gallatin Plant—but it expressly did not address how TVA should resolve those questions, nor did it address or relieve TVA from the obligation to comply with all

11

applicable federal, state, and local legal requirements in doing so. (Exh. 10, Consent Decree ¶ 203).

From a purely factual standpoint, TVA incorrectly argues that transfer would foster judicial efficiency because the Eastern District Court, unlike this one, retains the authority to modify the Consent Decree. As TVA is well aware, the Consent Decree was entered by different parties—including four states and two non-profit environmental organizations—that are not parties to this NEPA case. If it becomes necessary for TVA to seek a material modification to the Consent Decree, it will require invoking a new proceeding after providing notice to and involving several parties that are not present in this litigation. (*See, e.g.*, Exh. 10, Consent Decree ¶¶ 175-183, 198).

Thus, TVA has not met its heavy burden of showing that transfer is warranted to promote judicial efficiency, and its motion should be denied.

## II. Transfer Is Not Necessary to Protect the Integrity of the Federal Court System.

Without citing any authority, TVA argues that transfer is necessary to protect the federal court system from inconsistent representations. (Doc. 18, TVA Br. at 2.) Specifically, TVA argues that Sierra Club made conflicting representations by (1) recognizing that the Consent Decree promotes the public interest, and then (2) contending (along with three[23] other non-profit environmental groups) that TVA violated NEPA's mandate to take a "hard look" at the full range of environmental consequences of its proposed actions and to explore fully a reasonable range of alternatives prior to making its pollution control decision for Gallatin. In so doing, TVA misrepresents the context, nature, and limitations of the Consent Decree.

---

[23] TVA incorrectly asserts that there are only two other environmental non-profits involved in this case. (Doc. 18, TVA Br. at 2.)

12

As the terms of the Consent Decree show, Sierra Club has _not_ made conflicting representations to this Court and the Eastern District Court. The Consent Decree addressed TVA's historic and persistent failure to comply with the Act's new source review provisions and to modernize air pollution controls across its fleet when it performed major modifications to various coal-fired units. The parties to the Consent Decree correctly observed that it would be reasonable and appropriate for TVA to reduce harmful air pollution emissions at these units, as the Clean Air Act requires, rather than continuing to operate the units without modern air pollution controls. But the Consent Decree did not determine the best approach for doing so with respect to the Gallatin Plant. Instead, it authorized three approaches with vastly different impacts on the human environment—installing pollution controls, repowering with biomass, or retiring the units. The Consent Decree explicitly states that it does not immunize TVA from complying with other applicable legal requirements, such as NEPA. Further, the Consent Decree expressly reserves the parties' (including Sierra Club's) right to bring legal claims against TVA subsequent to lodging of the decree. Nothing about this NEPA action is inconsistent with the terms or requirements of the Consent Decree.

Accordingly, TVA has not satisfied its heavy burden of proving that transfer is warranted, and its motion should be denied.

### III. Plaintiffs' Choice of Venue Promotes the Public Interest in Deciding Local Controversies at Home.

Not only do the above factors fail to overcome the substantial deference afforded to Plaintiffs' choice of forum, but other factors also weigh substantially in Plaintiffs' favor. In particular, venue should be retained in the Middle District of Tennessee in order to promote the public interest "in deciding local controversies at home." _Smith_, 578 F. Supp. 2d at 962. People who live, work, and recreate in the vicinity of the Plant will be most directly affected by the

13

adverse health and environmental impacts of retrofitting Gallatin without complying with NEPA. The Life Extension Project will require the construction of two 12-story landfills;[24] it will increase the Plant's generation of toxic coal combustion waste by two to five times;[25] and it will perpetuate the withdrawal of more than 930 million gallons of water from the Cumberland River every day,[26] the discharge of more than 950 million gallons of contaminated waste water into Old Hickory Lake each day,[27] and the emission of nearly 4,442 tons of soot-forming sulfur dioxide, 1,100 pounds of smog-forming nitrogen oxides, and 39.2 pounds of toxic mercury pollution every year.[28]

As a result, this factor militates in favor of hearing the Gallatin NEPA case locally in the Middle District of Tennessee, where the effects of TVA's decision will be felt most strongly.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs urge the Court to deny TVA's motion to transfer venue.

Dated: June 3, 2013.

---

[24] Exh. 2c, TVA, Gallatin Final Environmental Assessment, at 135.
[25] *Id*. at 22.
[26] Exh. 1, TVA, Gallatin Fossil Plant – NPDES Permit No. TN0005428, at Section VIII, *Rationale*, issued June 26, 2012.
[27] Exh. 2b, TVA, Gallatin Final Environmental Assessment, at 50.
[28] *See* TVA, *Gallatin Fossil Plant Emissions Reported to Toxic Release Inventory*, available at http://www.tva.com/environment/air/gallatin.htm#tri (last visited May 24, 2013).

14

s/ John T. Suttles, Jr.
Delta Anne Davis (BPR # 010211)
Nathan T. Moore  (BPR # 31239)
John T. Suttles, Jr. (NC Bar # 34393)
Admitted *Pro Hac Vice*
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN  37206
Telephone: (615) 921-9470

Attorneys for Plaintiffs Tennessee Environmental Council, Tennessee Scenic Rivers Association, and Sierra Club

s/ Abigail Dillen*
Abigail Dillen
Admitted *Pro Hac Vice*
EARTHJUSTICE
156 William Street, Suite 800
New York, NY 10038
Telephone: (212) 845-7376 Ext. 7378

Attorney for Plaintiffs Tennessee Environmental Council, Tennessee Scenic Rivers Association, Sierra Club, and Center for Biological Diversity


s/ Craig Segall*
Craig Holt Segall (DC Bar No. 994417)
Admitted *Pro Hac Vice*
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St. NW, Eighth Floor
Washington, DC, 20001
Telephone: 202-548-4597

Attorney for Plaintiff Sierra Club


*   All signatories have consented to the filing of this document.

## CERTIFICATE OF SERVICE

I certify that on June 3, 2013, the foregoing Plaintiffs' Response to TVA's Motion to Transfer Venue was filed electronically through the Court's ECF system. Notice of this filing will be sent by operation of the Court's ECF system to: Tricia L. Roelofs (tlroelofs@tva.gov).

      s/John T. Suttles, Jr.

John T. Suttles, Jr.
Attorney for Plaintiffs